UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

WILLIAM ST. CLAIRE,

        Petitioner,

v.                                    Case No. 2:19-cv-720-JES-MRM

STATE OF FLORIDA,

        Respondent.

_____

## OPINION AND ORDER

This cause is before the Court on a 28 U.S.C. § 2254 petition for habeas corpus relief filed, through counsel, by Petitioner William St. Claire ("Petitioner" or "St. Claire"). (Doc. 1). At the Court's order (Doc. 9), Respondent filed a Response. (Doc. 12). St. Claire filed a reply (Doc. 16), and the petition is ripe for review.

Upon consideration of the pleadings and the state court record, the Court concludes that each of St. Claire's claims is unexhausted, without merit, or both. Because the Court was able to resolve the petition on the record, an evidentiary hearing is not warranted. See Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

## I.   Background and Procedural History

According to a report filed by the Collier County Sheriff's Office, an assault occurred on September 16, 2014 when St. Claire, who was friends with a young woman named Haley Brennan ("Brennan"), went to the home of Brennan, Brennan's boyfriend Julio Peon

("Peon"), and Peon's grandfather Orlindo Vigo ("Vigo").  (Doc. 13-2 at 20-27).[1]  St. Claire told police that he went to the residence to have a meeting with Brennan, Peon, and Peon's family about Brennan's drug use.  Id. at 26.  He said that Peon and his family were drug dealers.  Id.  St. Claire knocked on the door and was invited in by Peon and Vigo.  Id.  St. Claire showed them a piece of paper that detailed his history of running for Congress and giving speeches about drug use.  (Id.)  He demanded that Brennan pack her belongings and come with him so that he could check her into a hotel and bring her to a rehab facility the following day. (Id.)  He told police that Vigo then pulled out a firearm and shot at him, but missed.  (Id.)  The argument continued outside into the driveway, where Vigo shot at him again, but the bullet hit the ground.  (Id.)  When the police told St. Claire that there was no sign of a gunshot inside the residence, he said that Vigo shot at him only once and on the driveway.  (Id. at 27).

Brennan told the police that on the day of the incident, St. Claire accused her of using drugs and demanded a meeting with Peon and his family.  (Doc. 13-2 at 23).  She said that after Peon and Vigo answered St. Claire's knock, St. Claire "barged" into the home, yelling, and acting erratic.  (Id.)  St. Claire then threw a piece of paper at them and demanded that they all sit down. (Id.)

---

[1] Facts taken from police reports are offered for context only.

When Peon questioned why St. Claire was acting the way he was, St. Claire pulled out two guns and pointed them at Peon and Vigo. (<u>Id.</u>) St. Claire told Brennan to pack her things and come with him. (<u>Id.</u>) Peon then walked outside. (<u>Id.</u>) St. Claire, Vigo, and Brennan followed Peon outside where St. Claire pointed his firearm at Vigo and continued to yell. (<u>Id.</u>) St. Claire then fired a round into the ground and left. (<u>Id.</u>) Peon and Vigo made statements similar to Brennan's to the police. (<u>Id.</u> at 24).

On October 9, 2014, the State of Florida charged St. Claire with aggravated assault with a firearm on Orlando Vigo, a person 65 or older (count one) and aggravated assault with a firearm on Julio Peon (count two). (Doc. 13-2 at 29).

On September 9, 2016, the State filed a motion in limine asking the trial court to instruct St. Claire to refrain from asking questions about several subjects without first obtaining permission from the trial court. (Doc. 13-2 at 251-52). Included were:

- any allegation or belief that witness Haley Brennan used drugs;

- any allegation that victims Orlando Vigo or Julio Peon used drugs, sold drugs, manufactured drugs, or were involved in drug trafficking; and

- any mention of any witness's criminal history "without a good faith basis to believe such convictions actually exist and only then when testimony is elicited in accordance with [Florida evidentiary rules]."

(Doc. 13-2 at 251-52.)   At a hearing on the motion, St. Claire (proceeding pro se)[2] argued that, since he was asserting self-defense, Brennon's prior drug use was relevant to describe the environment he entered when he went to their home. (Doc. 13-3 at 15).   He made a similar argument regarding Vigo and Peon.   He said that he wanted to present evidence from out of state to prove that "[a]ll of these individuals had used drugs, admitted to drugs and dealt and trafficked in drugs."  (Doc. 13-3 at 20).   St. Claire argued that the evidence of Brennan's and the victims' drug use "needs to be brought in, because in order for the defendant to prove self-defense, the jury must understand he was not in a church with people praying.   He walked into a drug house."  (Id.)   The court granted the State's motion and explained why it was excluding evidence regarding the witnesses' drug use:

> If a person was under the influence of any drug or alcohol at the time, it would be relevant to affect their credibility, but not to prove that they're bad people. And we're not bringing in stuff from the state of Massachusetts.  It ain't going to happen.  Okay?
>
> You've got to get the concept of what's really relevant, and that's not relevant.

(Id. at 21).   The court also advised St. Claire that the mention of any witness's criminal history was limited to the number of the

---

[2] St. Claire initially proceeded in this action with defense counsel, but after hiring or being assigned eight different attorneys, he was permitted to represent himself after a Faretta inquiry.  (Doc. 13-2 at 235).

witness's prior felony convictions and the number of convictions for crimes of dishonesty.  (Id. at 30).

Trial commenced on September 19, 2016.  (Doc. 13-13 at 8). The State argued at trial that St. Claire was jealous that Brennan had a boyfriend and was not romantically interested in him even after "he spent money on her, training, dinners, fixing things for her."  (Id. at 508).  The State suggested that St. Claire wanted to remove Brennan from the house, and he wanted Vigo and Peon to know that Brennan belonged to him, not to Peon.  (Id.)  In contrast, St. Claire, who proceeded pro se at trial, argued that the shooting was in self-defense and that he had merely gone to the victims' home to discuss a "life threatening" situation with Brennan, Peon, and Vigo.  He was then attacked by Peon without provocation.  (Id. at 382, 432).  He believed that Vigo had a weapon, so he left the home.  (Id. at 432–33).  After he left, Peon rushed at him in the driveway, hit St. Claire's weapon, and it accidentally discharged.  (Id. at 433).

After a three-day trial, a jury found St. Claire guilty as charged.  (Doc. 13-2 at 303–04).  Petitioner received a sentence of five years in prison to be followed by five years' probation. (Id. at 330–33).  Florida's Second District Court of Appeal affirmed without a written opinion.  (Doc. 13-4 at 181).

Petitioner filed his federal habeas petition on October 3, 2019.  (Doc. 1).

## II.  Governing Legal Principles

### A.   The Antiterrorism Effective Death Penalty Act("AEDPA")

Under the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  When reviewing a claim under § 2254(d), a federal court must presume that any "determination of a factual issue made by a State court" is correct.  Id. § 2254(e). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  Id.  "Clearly established federal law" consists of the governing legal principles set forth in the decisions of the United States Supreme Court at the time the state court issued its decision.  White v. Woodall, 572 U.S. 415, 420 (2014); Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law if the state court either:  (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with

materially indistinguishable facts.  Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010); Mitchell v. Esparza, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, Brown v. Payton, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000) (quoting Williams, 529 U.S. at 406).

The section 2254(d) standard is both mandatory and difficult to meet.  To demonstrate entitlement to federal habeas relief, the petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  White, 572 U.S. at 420 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).

A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits—warranting deference.  Ferguson v. Culliver, 527 F.3d 1144, 1146 (11th Cir. 2008).  Generally, in the case of a silent affirmance, a federal habeas court will "look through" the unreasoned opinion and presume

that the affirmance rests upon the specific reasons given by the last court to provide a reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Wilson v. Sellers, 138 S. Ct. 1188 (2018).  However, the presumption that the appellate court relied on the same reasoning as the lower court can be rebutted "by evidence of, for instance, an alternative ground that was argued [by the state] or that is clear in the record" showing an alternative likely basis for the silent affirmance.  Sellers, 138 S. Ct. at 1196.

B.   **Exhaustion**

The AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of available relief under state law.  28 U.S.C. § 2254(b)(1).  Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]"  Duncan v. Henry, 513 U.S. 364, 365 (1995).

A petitioner can avoid the application of the exhaustion rules by establishing objective cause for failing to properly raise the claim in state court and actual prejudice from the alleged constitutional violation.  Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1179–80 (11th Cir. 2010).  To show cause, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state

court." <u>Wright v. Hopper</u>, 169 F.3d 695, 703 (11th Cir. 1999).  To show prejudice, a petitioner must demonstrate a reasonable probability the outcome of the proceeding would have differed. <u>Crawford v. Head</u>, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

A second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" <u>Murray v. Carrier</u>, 477 U.S. 478, 479-80 (1986).

### III. Discussion

St. Claire raises three claims of trial court error in his § 2254 petition.  These claims are exhausted only to the extent they were both raised in the trial court <u>and</u> considered by Florida's Second District Court of Appeal on direct appeal.  <u>See</u> <u>Jones v. State</u>, 998 So.2d 573, 581-82 (Fla. 2008) ("To be preserved, the issue or legal argument must be raised and ruled on by the trial court.")(internal quotation and citation omitted); Philip J. Padovano, <u>Florida Appellate Practice</u>, § 8.1, at 148 (2007 ed.) ("[T]he aggrieved party must obtain an adverse ruling in the lower tribunal to preserve an issue for review. . . . Without a ruling or decision, there is nothing to review.").  The Court separately addresses the exhaustion and merits of each claim.

**A.   Ground One**

St. Claire asserts that his right to due process was violated by the trial court's denial of his motion for costs to pay for a cell phone expert.  (Doc. 1 at 17).  Specifically, St. Claire complains that the trial court did not address his "Motion to Issue Subpoenas Duces Tecum" and "Motion to Incure [SIC] Costs for Forensic Expert Witness," which effectively deprived him of witnesses he needed to advance his defense.  (Id.)  He asserts that the trial court's failure to grant his motions amounted to a constitutional violation under Ake v. Oklahoma, 470 U.S. 68 (1985). (Id. at 19).

At issue were text messages between St. Claire and Brennan on the day of the incident that St. Claire wanted to introduce to show that "Brennan and Peon had agreed to meet with St. Claire and that Brennan believed Vigo and Peon suspected St. Claire was working with the police to obtain evidence against their drug organization."  (Doc. 1 at 18).  St. Claire argues that an "expert would have given [him] a fair opportunity to present his defense as it would have allowed the authentication of cell phone records crucial to the issue of self-defense and St. Claire's state of mind about the dangerousness of the complaining witnesses at the time he encountered them."  (Id. at 20).

St. Claire raised this claim on direct appeal.  (Doc. 13-4 at 110-14).  In response, the State argued that the claim was

procedurally defaulted because St. Claire did not obtain a ruling from the trial court on the motions before raising the claim on appeal.  (Id. at 150).  The State argued that St. Claire "simply filed his motions with the clerk and did not take any steps for the motions to be addressed by the Court.  Additionally, [on the same day he filed the motions] he filed a demand for speedy trial, bounding the Court to proceed to trial.  Therefore, the issue is not preserved for appeal."  (Id. at 153).

Although the state also addressed the claim on its merits in its response brief, Respondent now argues that "[w]here the state has briefed both an applicable procedural bar and the merits with respect to a given point, and the appellate decision is silent on the point, it should be presumed that the state decision rests on the procedural default." (Doc. 12 at 13) (citing Bennett v. Fortner, 863 F.2d 804, 807 (11th Cir. 1989)).  In turn, St. Claire argues that Ground One is not procedurally barred because he attempted to raise the issue in the trial court, but the court did not rule on his motions, and as a result, "[t]here was nothing more [he] could do."  (Doc. 16 at 4).

It is unclear from the record whether St. Claire sufficiently sought a ruling or a hearing on his motions.  However, it is unnecessary for the Court to determine whether Ground One is exhausted because St. Claire has not demonstrated entitlement to federal habeas corpus relief.  See Santiago-Lugo v. Warden, 785

F.3d 467, 475 (11th Cir. 2015) ("And because exhaustion is non-jurisdictional . . . a court may skip over the exhaustion issue if it is easier to deny (not grant, of course, but deny) the petition on the merits without reaching the exhaustion question."); 28 U.S.C. § 2254(b)(2)("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

St. Claire relies on Ake v. Oklahoma to support Ground One. In Ake the Supreme Court held that an indigent defendant has a right of access to a competent psychiatrist to assist in the preparation of his insanity defense. 470 U.S. at 83. St. Claire does not complain that he was denied access to a psychiatrist to prepare for an insanity defense, and he does not direct the Court to caselaw or any other authority showing that the Supreme Court or the Eleventh Circuit has expanded Ake to cover requests for non-psychiatric experts. Indeed, in Gary v. Hall, 558 F.3d 1229 (11th Cir. 2009), the Eleventh Circuit rejected a petitioner's similar free-standing Ake claim, concluding that he was not entitled to relief because the denial of funds to hire a forensic serologist was essentially a determination of state law, unreviewable on federal habeas review. Id. at 1251 n. 37. Consequently, as in Gary, St. Claire's "denial-of-funds claim

[does] not present a federal constitutional question, and [this ] court should not . . . entertain [] it." Id. at 1254.

Even if, in an abundance of caution, the Court addresses the merits of St. Claire's Ake claim as it relates to funding for a communications expert, he is not entitled to relief. The Eleventh Circuit has summarized the analytical framework used to address Ake claims as follows:

> Assuming, *arguendo,* that Ake extends to non-psychiatric experts, then we must determine (1) whether [the petitioner] made a timely request to the trial court for the provision of expert assistance; (2) whether it was "reasonable" for the trial court to deny [the petitioner's] request; and (3) whether the denial rendered [the petitioner's] trial fundamentally unfair. See Moore[v. Kemp], 809 F.2d 702, 710 (11th Cir. 1987)] (noting that the Supreme Court in Ake followed this three-part analytical approach). With respect to the third Moore requirement, we ask whether the Ake error "had substantial and injurious effect or influence in determining the jury's verdict." Hicks v. Head, 333 F.3d 1280, 1286 (11th Cir. 2003).

Conklin v. Schofield, 366 F.3d 1191, 1206–07 (11th Cir. 2004). Given the history of this case and the lack of an actual ruling on St. Claire's motions,[3] the Court first addresses Conklin's third

---

[3] This case took two years to get to trial. St. Claire asserts that he had eight separate attorneys before deciding to present his case pro se. (Doc. 13-3 at 234, 261, 379). A review of the trial transcript demonstrates that St. Claire had little understanding of evidentiary and procedural matters, and as a result, he had difficulty presenting his case to the jury. When urged by the trial judge to consider allowing standby counsel to take over at trial because he was "somewhat concerned that you're not up to this[,]" St. Claire argued that standby counsel was "worth his weight in gold," but St. Claire felt that he best knew the case. (Id. at 234). The court told St. Claire that he did not have authority to force St. Claire to use counsel, but he

element to determine "whether the denial [of money for a communications expert] rendered [St. Claire's] trial fundamentally unfair." Conklin, 366 f.3d at 1206. As noted, in Hicks v. Head, the Eleventh Circuit explained that the harmless error standard announced in Brecht v. Abrahamson, 507 U.S. 619 (1993) applies to Ake violations. Head, 333 F.3d at 1286. Under this standard, a constitutional error entitles a petitioner to federal habeas relief only if the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623.

St. Claire argues that an expert "would have given [him] a fair opportunity to present his defense as it would have allowed the authentication of cell phone records crucial to the issue of self-defense and [Petitioner's] state of mind about the dangerousness of the complaining witnesses at the time he encountered them." (Doc. 1 at 20). Although St. Claire argues that a paid expert could have authenticated the text messages, he does not assert that he actually attempted to authenticate the text messages in any other manner or that the trial court suggested that lack of authentication was the reason the messages were not admitted.[4] That St. Claire, proceeding pro se, was unaware of how

---

wanted "to make sure [St. Claire got] a fair trial." (Id. at 235).

[4] Notably, under Florida law, St. Claire did not need a paid communications expert to authenticate text messages that were

to authenticate a text message does not automatically give rise to a due process violation.  See McKenzie v. State, 153 So.3d 867, (Fla. 2014) ("A defendant who chooses to represent himself cannot later complain that the quality of his defense was substandard or amounted to ineffective assistance of counsel.").

Moreover, it does not appear that the texts were deemed inadmissible due to a failure of authentication.  In fact, the trial court allowed St. Claire to testify about the contents of the texts and his reasons for going to the victim's home.  During the defense case, St. Claire described his friendship with Brennan, and testified that he rented her a storage bin after she was evicted from her apartment. (Doc. 13-3 at 429):

> PETITIONER:   The date that I met her on September 15 was to take her to that storage bin and get it out of my name and put it in her name.
>
> And I talked to her father. I talked to other relatives, and it just was a safe place for all her stuff.

---

contained on his own phone, and written or received by him.  See State v. Torres, 304 S. 3d 781, 784(Fla 4th DCA 2020) (holding that electronic communications generally can be "authenticated by appearance, contents, substance, internal patterns, or other distinctive characteristics taken in conjunction with the circumstances"); Gilbert v. State, 324 So. 3d 598 (Fla. 2d DCA 2021) (admitting screenshots of Facebook Messenger messages after the victim testified that they accurately depicted what was on her Facebook Messenger); Symonette v. State, 100 So. 3d 180, 183 (Fla 4th DCA 2012) (finding that photographs of texts from the defendant's cell phone, combined with testimony of one of the texters, sufficiently authenticated the texts).

The date that I met her, on that date, was to take her back and get my name off of it.  That was the purpose of it.

She discussed several problems that she had. And some of those problems, I didn't believe to the extent she explained it. And so I asked to go ahead and meet with Julio Peon and Orlindo Vigo.

When I walked into that property, I ended up meeting them. And the tenseness of it changed.

And -- is it possible to say the messages I got at this time?  Because it is my testimony.

COURT:          Mr. Mortenson?

PETITIONER:     It's very relevant because –

STATE:          The State would object to it, hearsay.

PETITIONER:     It's – it says to the level already –

STATE:          There's no way to authenticate them.

PETITIONER:     I know, but it's what I'm saying I got.

COURT:          Okay. Objection overruled. Go ahead.

PETITIONER:     Let me (indiscernible).

STATE:          Your Honor, I object to him reading anything.

COURT:          Sustained.

PETITIONER:     Okay. On the date that I showed up at the property, her vehicle wasn't at where her residence was. It was at Julio Peon's work, and I thought she just wasn't home. So I sent a message, where are you. And she says she was here, meaning her residence. That was at 12:00.

16

She talked to me between 12 and 3. And she went into great deal about many things. Some of those things do not pertain to this legal, and I won't discuss it, but to the life-threatening issues that she was potentially faced, I was concerned. She was concerned.

And so that's when I asked her that we should sit down with Julio Peon and Orlindo Vigo, because I wanted to see what was truth and what was fiction.

She, I think, explained to them –

STATE:          Objection, hearsay.

PETITIONER:     Okay.

COURT:          Sustained.

PETITIONER:     I received a message that stated—

STATE:          Objection, hearsay.

PETITIONER:     Okay.  She told me –

COURT:          Overruled.  Go ahead.  You can answer.

PETITIONER:     -- that they --Julio and Orlindo -- Julio Peon and Orlindo Vigo thought that Haley and I were setting them up. And she felt that there was a danger there. And she described it as an emergency.

Now, it wasn't in the context -- it was something that you would sit down to discuss, but I think that because she had opened up to me between the 12 and 3 p.m., I think Orlindo Vigo and Julio Peon were worried about what she had divulged.

And so when I walked back into that residence, I proceeded to try to talk to these individuals.  And Julio Peon was not his self, and he said that in his depositions.

17

> And the mere fact of handing something
> that I had participated in to enter the
> discussion, somehow Julio took that wrong
> and he heard that he bounced me around
> the room. He's a strong person. And there
> was no provocation. There was no threat.
> And then that's when I what I thought I
> saw is Orlindo having a pistol on his
> side.
>
> Ms. Brennan and Julio Peon did not know
> that. And that's why in this entire
> testimony, they're confused. They don't
> know, really, what went on.

(Doc. 13-3 at 429-32).  Thereafter, St. Claire reiterated that he

went to the apartment to ensure that Brenan was safe and that he

was "completely shocked" when he was attacked by Vigo and Peon.

(Id. at 435).  He stated that he went "to discuss a specific topic

that [Brennan] needed. It was a life and death situation."  (Id.

at 436).

The Court has reviewed the entire trial transcript and

concludes that St. Claire's testimony and other evidence presented

at trial provided a thorough picture of the text messages and the

alleged reasons St. Claire went to the victims' home.  Given that

St. Claire was allowed to testify about the content of the texts,

it is unclear what additional evidence would have been before the

jury had an expert testified as to the texts' authenticity.   St.

Claire's argument that he would have been able to present evidence

to the jury that would have resulted in his exoneration if the

court would have given him funds for an expert is based on mere

conjecture.  "The Brecht standard reflects the view that a 'State

is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.'" Davis v. Ayala, 576 U.S. 257, 268 (2015) (quoting Calderon v. Coleman, 525 U.S. 141, 146 (1998)). This Court does not make this finding.

St. Claire has not shown that any Ake error actually occurred, much less caused prejudice under Brecht. And as a result, his stand-alone Ake claim, even if applicable to non-psychiatric experts, had no effect on the verdict and any error that may have occurred was harmless. Ground one is denied.

**B.   Ground Two**

St. Claire asserts that "[t]he trial court misapprehended the reason [he] wanted to introduce the evidence of why he went to the house where the incident occurred. This misapprehension led to the violation of [his] right to fully testify in his own defense." (Doc. 1 at 23). Specifically, St. Claire argues that the trial court had ruled, in response to a motion in limine, that St. Claire could not introduce evidence of Brennan's drug use to "show that she's just a bad person." (Id.) St. Claire now argues:

> The court's analysis was wrong and a violation of federal
> constitutional guarantees. Throughout the trial, both
> the court and the prosecutor continually misapprehended
> the issue, referring to St. Claire's attempts to
> introduce evidence of Brennan's "drug use" rather than St.
> Claire's defense as to why he was at the house that
> day: to discuss Brennan entering a drug rehabilitation
> facility. This evidence, along with the text messages

from Brennan that the court did not admit, contradicted the prosecution's argument that St. Claire was unexpected and uninvited.

(Id. at 23-24).   St. Claire asserts that the trial court's misapprehension of his reasons for wanting to raise Brennan's drug use violated his constitutional rights under Davis v. Alaska, 415 U.S. 308, 315 (1974) and Rock v. Arkansas, 483 U.S. 44 (1987).

Respondent argues that Ground Two is unexhausted because St. Claire "did not fairly present the trial court his ground by timely objecting to the evidence on constitutional dimension and requesting a ruling on the constitutional claim."   And, because St. Claire did not fairly present this ground to the trial court, it was not preserved.   (Doc. 12 at 20).   In reply, St. Claire argues that he repeatedly tried to elicit the testimony held to be inadmissible by the trial court, but was stymied by the court's rulings on the State's motion in limine.   (Doc. 16 at 7-8). However, he does not allege that he raised or argued to the trial court that the failure to allow evidence of Brennan's drug use was a federal constitutional error or that he objected to the State's motion in limine on constitutional grounds.   Rather, he now asserts that the trial court "is presumed to know" the Supreme Court holdings "that the Confrontation Clause guarantees criminal defendants the right to cross-examine those who testify against them[.]"   (Id. at 8).

20

The Court finds that St. Claire did not exhaust this claim because he never raised it at the trial court level. The presumptive knowledge of the trial court (or lack thereof) has never been held to excuse a habeas petitioner's failure to actually raise a constitutional issue at the trial court level. For this Court to conclude otherwise would ignore binding Supreme Court and Eleventh Circuit precedent requiring exhaustion of all constitutional claims in state court before raising them in federal court. See Baldwin v. Reese, 541 U.S. 27, 32 (2004) (holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material . . . that does so"); Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1350 (11th Cir. 2004)("It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made. To exhaust the claims sufficiently [the petitioner] must have presented the state court with this particular legal basis for relief in addition to the facts supporting it."). Petitioner does not show cause for his failure to exhaust this claim or assert a fundamental miscarriage justice. Accordingly, Ground Two is subject to dismissal as unexhausted.

Even if St. Claire had exhausted Ground Two, he is not entitled to federal habeas relief. 28 U.S.C. § 2254(b)(2). First, the Court finds no constitutional error in the state court's evidentiary rulings,[5] and to the extent St. Claire alleges a violation of state law, such claim is not cognizable on habeas review. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Next, as discussed in Ground One, claims of trial court error are subject to Brecht's harmless error review, and St. Claire has not shown that the trial court's failure to allow additional testimony regarding Brennan's drug use (as the reason he went to her house) had a substantial and injurious effect on the proceedings.

St. Claire argues that he should have been allowed to testify that "he was invited to the house by Brenan and was expected, and that the other occupants of the house had violent reputations known to him." (Doc. 16 at 7). Notably, St. Claire was allowed to ask Brennan his reasons for coming to the house, and she testified that she "honestly [didn't] know. Sorry. Sorry." (Doc. 13-3 at 218). St. Claire later re-asked the question, noting that "[t]he reason that I was meeting you that day, you don't remember going

---

[5] Notably, the trial court did not make a carte blanche ruling that St. Claire could not mention drugs at all during the defense. Rather, the judge granted the State's motion in limine to the extent that St. Claire could not mention drugs without first "obtaining permission from the Court outside the presence and/or hearing of the jury". (Doc. 13-2 at 251).

to the storage bin that had been leased?  I was getting it out of my name and putting it in your name?"  (Id. at 227).  Brennan answered, "I don't remember exactly why you agreed to meet me that day."  (Id.)

Likewise, Peon also testified that he did not know why St. Claire was at the house on the day of the incident.  Peon testified that after St. Claire knocked on the door, "he kind of just like rushes in.  And so I mean, I knew something was up there at that moment."  (Id. at 241–42).  He testified that he had met St. Claire "four or five" times, and that there was no hostility towards him.  (Id. at 249)  St. Claire asked Peon why he (Petitioner) had gone to the house.  (Id. at 251).  The State objected to the question, and the judge excused the jury so that he could hear Peon's answer.  (Id. at 252–53).  Peon told St. Claire that he did not have any recollection of St. Claire coming to the house for a discussion on drugs.  (Id. at 255, 259).  Thereafter, the judge explained to St. Claire that, while Peon had denied knowing why he was at the house, he (St. Claire) was free to testify about his own reasons for being there.  (Id. at 259).  When the state objected and argued that St. Claire should not be allowed to talk about drugs, the trial court, seemingly exasperated, noted:

> I mean, if the defendant wants to get up on the witness
> stand and tell this jury that he went to a house to talk
> to people about drugs, and he's bringing guns with him,
> and goes into their house, if that's what you really

want to do, you know, knock yourself out. That's a sure
loser for you, going into a drug house carrying guns, is
that what you want to do? That's fine. You go ahead and
do that.

. . .

Because you'll – the jury is going to look at that . .
. and go, why is this guy coming to this house knowing
there's a drug deal going on, there's . . . drugs there,
and he's bringing guns with him?

. . .

I just think you need to talk – you need to have co-
counsel, you need to have Mr. Baker become your counsel
in this case.

(Id. at 260-61).  St. Claire protested the court's suggestion that

he proceed with counsel and stated that he wanted to continue

representing himself.  The court then asked St. Claire whether he

thought "telling the jury that you went there because you knew it

was going to be about drugs or there was a drug deal or whatever

it was, and you brought guns with you to a house, that's your –

that's your trial strategy?  Knock yourself out."  (Id. at 262).

Clearly, the trial judge backtracked from any prior ruling that

prevented St. Claire from explaining that he went to home of

alleged drug dealers to talk about drugs.

Moreover, the jury heard St. Claire's alleged reason for going

to the house through the testimony of Police Sergeant Goldhorn.

The state questioned the officer about St. Claire's explanation

(made immediately after his arrest) of why he was at the residence:

Q.   Did the defendant tell you how he came to be at
that residence?

24

A.   Yes, sir.

Q.   How did he did he discuss with you how he entered
     the residence?

A.   Yes, sir.

Q.   And what did he tell you?

A.   He said he knocked on the door and Julio and
     Orlindo, the grandfather, invited him in. Opened
     the door and then invited him in.

Q.   Okay. And what did he tell you happened once he was
     inside?

A.   He said he sat down for a meeting with  them.

Q.   Okay. And what came of that meeting?

A.   Basically, he wanted to discuss drug use. He
     presented them with a piece of paper. He explained
     that he presented them with a piece of paper, I
     believe it was an e-mail, explaining how he has
     history talking about drug use.

     And they -- he said that he accused Julio of being
     a drug dealer, and Julio – they had an argument.
     He told Haley that he's (sic) coming with me. And
     that he wanted

Q.   I'm sorry. Who said that Haley was coming with him?

A.   Mr. St. Claire.

Q.   Okay. So he acknowledged in a statement to you that
     he was going to take Haley Brennan out of that home?

A.   Yes, sir.

(Doc. 13-3 at 361–62).  Finally, at trial, St. Claire testified

that he went to the home to discuss "life-threatening issues" that

Brennan faced because he "wanted to see what was truth and what

was fiction." (Id. at 431).  He testified:

> [Brennan] had sent me messages of going from meeting at
> 4 to 4:15.  I went into a place that I had an appointment
> with.  I went in there to discuss a specific topic that
> they – that specifically Ms. Brennan needed.  It was a
> life and death situation.  And so, to me, it was
> something that I had to address that day.

(Id. at 436).  The record shows that, in addition to not being precluded from testifying that he went to the house to talk about drugs, the information regarding why St. Claire went to the house was actually before the jury.

To the extent any constitutional trial court error occurred, the Court finds that it did not have a substantial or injurious effect in determining the jury's verdict.  In addition to being unexhausted, Ground Two is denied on the merits.

### C.   Ground Three

St. Claire asserts that the trial court's prohibition on "evidence of [Vigo's and Peon's] drug trafficking to show [his] fear of the alleged victims as character evidence" violated his constitutional right to defend himself.  (Doc. 1 at 30).  St. Claire argues that "both state and federal courts readily accept the proposition that 'guns often accompany drugs.' " (Id.) Therefore, argues St. Claire, he had "a reasonable fear of Vigo and Peon, and their character was admissible to explain St. Claire's fear and why he went to the house prepared to defend himself[.]" (Id. at 30–31).  St. Claire claims that he was denied a meaningful opportunity to present a complete defense, violating both the Due Process Clause of the Fourteenth Amendment and the

Compulsory Process and Confrontation Clauses of the Sixth Amendment. (Id. at 31) (citing Holmes v. South Carolina, 547 U.S. 319, 319 (2006); Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

St. Claire presented a similar argument in his brief on direct appeal. In response to St. Claire's argument on appeal, the state conceded that when a defendant asserts a claim of self-defense, the victim's reputation evidence may be admissible to show that the victim acted consistently with his reputation for violence. And "specific acts of violence, if known by the defendant" may be admissible to prove "that the accused was reasonably apprehensive of the victim and that the defensive measures of the accused were reasonable." (Doc. 13-4 at 136) (citing Mohler v. State, 165 So. 3d 773, 775 (Fla. 2d DCA 2015); Shreiteh v. State, 987 So. @d 761 (Fla 4th DCA 2008)). However, the State noted that, according to St. Claire's comments during the hearing on the motion in limine, "most of the information that he learned about the victims' criminal records came from an investigator that was hired after [Petitioner] was arrested." (Doc. 13-4 at 137 (citing Doc. 13-3 at 31)). Moreover, St. Claire admitted to the trial court that he did not believe the house was a "drug house" when he entered it. (Doc. 13-4 at 137 (citing Doc. 13-3 at 262)). And, during St. Claire's closing argument, he told the jury:

> I went into that house believing that this was not true.
> I went into this house saying these are great people.
> I had never pulled any type of research on these people,
> no police report. I went in believing that Haley had a

> certain health issue, certain problems, but everything
> else was just a complete lie.  That's what I believed.
> I was not concerned about Julio Peon or Orlando Vigo
> attacking me.

(Id. (citing Doc. 13-3 at 548)).  Therefore, "[Petitioner] himself

denied any apprehension, thus the [state court] was correct in

denying his attempt to introduce any specific acts."  (Id. at

138).  The State also argued that Vigo's decades-old drug

trafficking offense did not constitute reputation evidence.  (Id.)

Respondent now argues that Ground Three is unexhausted for

habeas review because St. Claire did not "fairly present the

constitutional dimension of [Ground Three] at trial **and**

subsequently on direct appeal."  (Doc. 12 at 29 (emphasis in

original)).  Indeed, to the extent St. Claire argued this issue

at the trial court level, a complete review of the record does not

show that it was ever presented as a federal constitutional claim.

And St. Claire raised this claim on direct appeal in terms of state

law only.  (Doc. 13-4 at 90-94).  In his appellate brief, St.

Claire's only mention of federal law is an argument that "[b]oth

state and federal courts, when examining a law enforcement

officer's actions, readily accept the proposition that 'guns often

accompany drugs.' " (Id. at 92).  St. Claire' argued:

> Why can only a police officer fear for their safety when
> dealing with individuals who are drug traffickers?
> Common sense is common sense.  If "guns often accompany
> drugs" then St. Claire had a reasonable fear of Vigo and
> Peon, and their character was admissible to explain St.
> Claire's fear and why he went to the house prepared to

defend himself with firearms he had a concealed permit to carry.

(Doc. 13-4 at 93).  St. Claire did not mention due process or the Sixth Amendment in his brief on appeal, and the federal case he cited did not stand for the proposition he urges here.[6]  Rather, St. Claire relied solely on Florida evidentiary rules to support his argument that he should have been allowed to testify that "Vigo had a prior drug trafficking arrest in which he pled guilty to a lesser charge of possession with intent to sell cocaine.  By virtue of his contact and discussions with Brennan, [Petitioner] was aware of Vigo's record and Peon's participation in drug trafficking." (Id. at 90).

Although St. Claire's state claim was similar to the one raised here, for exhaustion purposes, it is not sufficient that a similar claim has been through the state courts.  Rather, federal courts require "a state prisoner to present the state courts with the same claim he urges upon the federal courts."  McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005) (emphasis added). As part of such a showing, the claim presented to the state courts

---

[6] In his appellate brief St. Claire cited United States v. Oriach, 222 F. App'x 312, 318 (4th Cir. 2007) for the proposition that, in the context of a stop-and-frisk, it may be objectively reasonable for an officer to believe that a person engaged in selling drugs may be carrying a weapon because "guns often accompany drugs."  (Doc. 3-4 at 92).  As argued by Respondent, Oriach (an unpublished Fourth Circuit case) does not stand for the proposition that certain types of character evidence is admissible in a self-defense trial.  (Doc. 12 at 29-30).

"must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." <u>Reedman v. Thomas</u>, 305 F. App'x 544, 545-46 (11th Cir. 2008) (internal citation omitted).  St. Claire's failure to apprise the state courts of the constitutional nature of this claim (both at the trial and appellate levels) leaves it unexhausted on federal habeas review.  Petitioner does not show cause for his failure to exhaust this claim or assert a fundamental miscarriage justice.  Accordingly Ground Three is subject to dismissal as unexhausted.

Even had St. Claire exhausted Ground Three, he is not entitled to federal habeas corpus relief.  28 U.S.C. § 2254(b)(2). Notably, Petitioner has not demonstrated that the trial court's failure to allow character evidence was more than harmless error.[7] First, while Vigo's and Peon's reputation for violence may have been relevant to his self-defense claim, St. Claire has not offered evidence of their reputation in the community.[8]  See <u>Dean v. State</u>, 843 So. 2d 926, 928 (Fla. 5th DCA 2001) ("Traditionally, character is proved by evidence of the individual's reputation in the community for the character trait involved.").  Vigo's twenty-

---

[7] As in Ground Two, the Court finds no constitutional error in the state court's evidentiary rulings, and to the extent St. Claire alleges a violation of state law, it is not cognizable on habeas review.

[8] Nor does he do so here.

year-old arrest for possession with intent to sell cocaine would not have been admissible for that purpose.  See Taylor v. State, 513 So. 2d 1371 (Fla. 2d DCA 1987) (holding that evidence of the victim's prior arrest and prior "bad acts" were not admissible as reputation evidence in a self-defense trial).  Therefore, any claim that such evidence would have been admitted and convinced the jury that St. Claire acted in self-defense is merely speculative and cannot support a claim for habeas relief.  See Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991)(recognizing that vague and conclusory allegations are insufficient to support a claim for habeas relief); Sargent v. Armontrout, 841 F.2d 220, 226 (8th Cir. 1998) ("When seeking habeas relief, the burden is on the petitioner to prove that his rights have been violated. Speculation and conjecture will not satisfy this burden").

Next, a review of the trial transcript shows that the jury was well aware that Petitioner thought Peon and Vigo were involved with drugs.  St. Claire impeached Vigo with his prior felony conviction, and mentioned the conviction to the jury at least three times.  (Doc. 13-3 at 447, 522, 526).  Sergeant Goldhorn testified that St. Claire told the police that he went to the house to talk about drugs and that St. Claire believed that Peon and Vigo were drug dealers.  (Id. at 361–62).  Throughout his closing argument, St. Claire talked about Brennan's "life threatening" issues and said that "Julio Peon and Orlindo Vigo thought that Haley and I

31

were setting them up. And she felt that there was a danger there. And she described it as an emergency." (Id. at 431). He argued that the altercation "happened because Haley Brennan scared them. Haley Brennan had revealed secrets of this family to me and they were worried that I would know it and what would I do with it." (Id. at 546). He repeatedly told the jury that the victims were scared of what he knew. (Id. at 555, 556). He told the jury that there were always a lot of men in the house, described as "a small army" (id. at 435, 454, 548), and he described the neighbor across the street as Orlindo Vigo's "sentry." (Id. at 436).

To the extent any constitutional trial court error occurred, the Court finds that it did not have a substantial or injurious effect in determining the jury's verdict. Notwithstanding St. Claire's argument that he acted in self-defense and the implications that the victims were somehow involved in drug trafficking, the jury believed Brennan's, Vigo's and Peon's version of events and rejected St. Claire's claim of self-defense. In addition to being unexhausted, Ground Three is denied on the merits.

## IV. Conclusion

Based on the foregoing, St. Claire is not entitled to relief on the habeas claims presented here. No allegation not specifically addressed has been found to warrant habeas relief.

Accordingly, it is ordered that:

1.   Ground One of St. Claire's 28 U.S.C. § 2254 petition is **DENIED**.   Grounds Two and Three are **DISMISSED** as unexhausted.   Alternatively, Grounds Two and Three are **DENIED**.

2.   The Clerk is **DIRECTED** to enter judgment in favor of Respondent and against Petitioner, deny any pending motions as moot, terminate any deadlines, and close this case.

## Certificate of Appealability[9]

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1).   Rather, a district court or circuit justice or judge must first issue a certificate of appealability (COA).   "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   To make this substantial showing, St. Claire "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Slack v. McDaniel, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).   When,

---

[9] Under Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

as here, the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484.

Upon consideration of the record, the Court declines to issue a COA. Because St. Claire is not entitled to a COA, he is not entitled to appeal in forma pauperis.

**DONE AND ORDERED** in Fort Myers, Florida on June 3rd, 2022.

_____

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

SA:  FTMP-2

Copies furnished to:
Counsel of Record
Unrepresented Parties